# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### DELTA DIVISION

SOUTHERN FORESTRY
AND WILDLIFE, LLC d/b/a
Southern Forestry and Wildlife Real
Estate                                                        PLAINTIFF

v.                              No. 2:23-cv-189-DPM

DON BULLARD and CROOKED BAYOU
PROPERTIES, LLC                                              DEFENDANTS

## ORDER

This case is about an unpaid commission on a land sale. During a long but necessary preface, keep in mind several people. Two brothers, Walter and Bob Hixson. Bob ended up buying the property at issue. Benton Gann, the broker who didn't get paid. Don Bullard, the seller. And the person between them, Mark Azlin, who managed Bullard's property.

*

Through one of his several companies, Bullard owned the Ducks and Bucks Hunting Club in Chicot County. It was originally a gathering place for Bullard's friends and business associates. In time it became a commercial venture open to paying hunters. The property included a lodge and approximately 2300 acres of prime hunting land protected by conservation and wetland programs. It was "nothing but

a jungle" near Crooked Bayou until Bullard spent years improving it. *Doc. 15-9 at 12.* Eventually, he decided to sell. Bullard was sentimental about the place; he cried when he sold it the first time. *Doc. 15-9 at 12.* When those buyers couldn't finish paying what they owed him, Bullard took the property back. It had fallen into disrepair. Restoring the property was hard. "It don't take long to -- for the fun to run out of it." *Doc. 15-9 at 5.* Bullard decided to keep trying to sell it.

Mark Azlin worked at the Club, mainly as a cook and on-site manager. He tried to help Bullard find a buyer. Bullard told Azlin he'd take care of him if he did. There were many prospects, but none panned out. Bullard grew frustrated. But he didn't want to list the property with a land broker because he was skeptical of them.

Enter Benton Gann—lawyer, wildlife biologist, registered forester, and licensed real estate broker. A mutual acquaintance connected Gann and Azlin. Gann prepared a draft "Real Estate Showing Agreement." After making some tweaks at Azlin's direction, based on Azlin's conversations with Don Bullard's wife, Gann signed. Mrs. Bullard then signed for her husband. She had his authority to do so. *Doc. 15-9 at 12.* "I build highways," Mr. Bullard said when asked about his work. *Doc. 15-9 at 3.* Mrs. Bullard took care of business when he was on the road. The parties' agreement is attached. Bullard said he knew nothing about it until this dispute arose.

The deal was not an exclusive listing agreement. As Azlin and everyone else knew, Bullard was adamantly against that kind of arrangement. Gann had to identify prospects. If he did, Bullard agreed to pay "a real estate commission for the procurement of a buyer for [the property]." Note that word "procurement." The parties' agreement is silent about what the term requires. The commission was $200,000, or more, depending on the sale price. The agreement identified two prospects by name. It also allowed Gann to name others: "Any potential buyer will be identified to SELLER either directly or through Mark Azlin, SELLER's manager."

Gann went to work. He spent a weekend at the property with Azlin. It rained one day, but he inspected and photographed the buildings and the land. Those buildings included a lodge with nine bedrooms. *Doc. 15-8 at 8.* Gann also prepared a brochure.

His first prospect was interested. Gann arranged another site visit with Azlin. They showed the first prospect around the property. No deal materialized, though.

Gann's second prospect was another real estate guy, a lawyer-mentor of his. Gann pitched the property to him in a conference call. They reviewed the brochure during that call. *Doc. 15-6 at 13.* No deal.

Then, as the agreement allowed, Gann identified two more prospects. He texted Azlin: "For the sale agreement, it is Walter and Bob Hixson". *Doc. 17 at 6.* Azlin didn't inform Mr. or Mrs. Bullard

about the Hixsons. Gann was acquainted with Walter, who lives in Little Rock. He has never met or talked to Bob. Bob lives in Dallas. Gann said "You always deal with Bob's people." *Doc. 15-6 at 12.* Gann called Walter, they exchanged texts, and Walter invited him to his house. Gann went. They reviewed the brochure and discussed the property. There were more texts. Walter was hesitant throughout these discussions. No deal was made after the meeting at Walter's house. Walter told Gann "It wasn't a good fit." *Doc. 15-6 at 16.*

Gann followed up a few weeks later. He called Walter. And Gann's mentor (prospect #2) contacted Walter about a joint venture. Walter rejected both overtures. *Doc. 15-6 at 16-17.* Gann and Walter never went to Chicot County to see the Club.

All this happened in March 2021, in the weeks after the parties signed their real estate showing agreement. Eight or nine months later, a man named Steven Son contacted Bob Hixson about the Club. Son said he had the property under contract and wanted to sell it to Bob. They met at the Buck and Ducks Club. They toured the property with Azlin.

During that visit, it came out that Bullard hadn't yet signed the proposed contract involving Son and others. Bob was upset. While everyone was at the property, he talked on Azlin's cell phone with Bullard. Bob offered to pay Bullard's asking price in cash for the Club property, plus approximately 1000 more acres of adjoining cropland

-4-

that Bullard had recently acquired.  Bob also said they'd close in less than a month.  *Doc. 15-9 at 15.*  Bullard agreed.  Bob left a $100,000 personal check with Azlin.  Bob also "Dog-cussed [Son] all up and down because he brought him out there . . . under the impression that they owned that land, had it under contract, and he was going to sell it to him for about $2 million more than what Bob Hixson bought it for." *Doc. 15-9 at 14.*  The record suggests that Bob softened a bit and paid Son something eventually.  *Doc. 17-3 at 26.*  The Bullard/Hixson deal closed as planned for $7,750,000.  *Doc. 15-9 at 14.*

Good to his word, Bullard took care of his manager, Azlin, with a $150,000 payment.  He also paid $82,000 to a local real estate broker who had been working on selling all the property.  That was a handshake deal.  There was no written agreement in place.  No commission went to Gann.  He found out about the sale several months later.

Gann called Azlin and reminded him about the agreement and his having provided Walter and Bob Hixson's names to him.  Azlin "got real squirrely and said call [Mrs. Bullard]." *Doc. 15-6 at 18.*  He did.  She sent him to her husband.  Gann called Bullard, who was flabbergasted. "And he called me and said I understand you sold that property in Arkansas, and you're under contract with me, and you owe me the—I think he told me $200,000.  I think that's what it was said I owed him, and I'm like who are you.  I don't even know you.  I mean that place has been sold and that's hell, six or eight months ago." *Doc. 15-9 at 10.*

Bullard contacted his former manager Mark Azlin, who contacted Bob Hixson, who said he'd never heard of Gann or talked to him.  Bullard put it back on Azlin.  "[W]ell, this man says I owe him $200,000, and I don't even know who the hell he is, Mark, so is this another one of your deals."  *Doc. 15-9 at 17.*

Gann never communicated directly with Bob.  He doesn't know if Walter showed Bob the brochure.  *Doc. 15-6 at 13.*  When asked what he did to procure Bob as the eventual buyer, Gann said:

- "Handed them our -- or handed Walter a brochure, which I assume, you know, went to Bob.  Put the property on their radar, and so they knew about it being for sale."  *Doc. 15-6 at 16.*

- "They work together.  They talk about stuff.  I mean they're in business -- they have a multi-gazillion dollar lumber -- treated lumber business.  They, you know, just recently sold.  The work together, and they talk together.  So when you deal with one, you deal with the other."  *Doc. 15-6 at 24.*

- "And so if you're dealing with one, you're dealing with the other . . . That is my understanding of how their business works and . . . It was my impression from Walter . . . It was my impression through conversation with Walter, that's how they operate."  *Doc. 15-6 at 25.*

\*

Gann's company, Southern Forestry, has sued Bullard and his company, Crooked Bayou Properties. Each side seeks summary judgment. The Court's statement of the facts is lengthy. But this case illustrates the maxim: The law arises out of the facts. *Ex facto jus oritur.* The record is mostly undisputed. Where there is some disagreement, the Court has taken the material facts in the light most favorable to the non-moving party at risk of losing short of a jury trial. *Van Dorn v. Hunter*, 919 F.3d 541, 544 (8th Cir. 2019).

\*

*First*, Bullard's motion for summary judgment on Gann's alternative unjust enrichment claim is granted. Gann hasn't responded to Bullard's arguments here. The general rule controls; none of the many exceptions to that rule applies; and the parties' agreement covers their dispute. There's no hole for a restitution-based claim to fill. *Friends of Children, Inc. v. Marcus*, 46 Ark. App. 57, 61, 876 S.W.2d 603, 605–06 (1994); *United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 606–07 (8th Cir. 1999) (Richard S. Arnold, J.). This claim is dismissed without prejudice.

*Second*, Gann's motion for summary judgment is denied. The record does not entitle him to judgment as a matter of law. At most, it may present a jury question on breach of contract.

Gann's contention that, under the parties' agreement, the mere naming of a prospect who becomes the buyer entitles Gann to a commission is a bridge too far. That wasn't the deal. He was entitled to be paid "for the procurement of a buyer . . .." There's some ambiguity embedded in that key word. As the parties' competing dictionaries show, procurement can mean either getting something (which favors Gann's identification-only reading) or bringing something about, such as a sale (which favors Bullard's identification-plus-efforts reading). *Compare Doc. 15 at 11, with Doc. 20 at 3, and Doc. 22 at 3.*

But the background law clarifies the uncertainty lurking in the word procurement. Parties always contract in the context of existing law. *Petty v. Missouri & Arkansas Railway Co.,* 205 Ark. 990, 996, 167 S.W.2d 895, 898 (1943). It's incorporated in their agreements. *Ibid.* The procuring-cause doctrine has been part of the Arkansas law about brokers and sales for more than a century. *E.g., Farm Credit Bank of St. Louis v. Miller,* 316 Ark. 388, 392, 872 S.W.2d 376, 379 (1994); *Hodges v. Bayley,* 102 Ark. 200, 202-03, 143 S.W. 92, 93 (1912). "We have long recognized that a broker is not allowed to recover a commission when he merely performs one event in a chain of actions. He must be a proximate cause of the eventual sale rather than a mere incidental link, and the sale must be a result of his continuous course of conduct."

*Miller*, 316 Ark. at   392–93, 872 S.W.2d at 379; *see also Hatchett v. Story*, 221 Ark. 120, 123, 252 S.W.2d 78, 79–80 (George Rose Smith, J.).

While parties probably could contract around this settled law with a gin-clear agreement to the contrary, that didn't happen here. The parties' muddy term brought the old legal soil with it. Perhaps because exclusive listing agreements using the Arkansas REALTORS® Association's form contracts are ubiquitous, the procuring-cause doctrine is not often invoked these days. But, the Court concludes, at least preliminarily, that this case turns on this venerable legal principle.

Gann implicitly recognized this point on deposition. When confronted with the "you could just provide the telephone book" hypothetical, he bristled. "I'm only identifying buyers I'm approaching . . . I wouldn't have given a name if I wouldn't have approached them." *Doc. 15-6 at 22.* He didn't name "Sam Walton" or "Barack Obama" or "put the Little Rock phone directory" in a notice to Bullard/Azlin. *Doc. 15-6 at 22–23.* He identified four prospects — or maybe three, if the Hixson brothers are considered as one. That last possibly brings the Court to Bullard's competing request for judgment as a matter of law on Gann's breach claim.

*Third*, Bullard's motion on this claim is denied without prejudice. While the record leans hard in Bullard's favor, there's an evidentiary gap. Walter Hixson was not deposed. He didn't provide an affidavit.

Bob Hixson was not deposed. He did provide an affidavit. It is, of course, a lawyerly document. Bob said:

- "Affiant further states that the following circumstances explain, in summary, the manner by which Affiant learned of, and later became involved with, the property Affiant purchased from Don A. Bullard/[Crooked Bayou Properties] in February 2022." *Doc. 15-5 at 2.*

Bob then described his interactions with Steven Son (the attempted flipper), Stacey Gillison (the other broker), and Bullard in December 2021 and January 2022. *Doc. 15-5 at 2–3.* The affidavit continues:

- "Affiant did not discover/learn that Don A. Bullard/CBP's property was for sale through or from Benton Gann . . .." *Doc. 15-5 at 3.*

- "In summary, Affiant first learned that Don A. Bullard/CBP's property was for sale, or potentially for sale, when Steven Son led Affiant to believe that [Son had the property under contract]." *Doc. 15-5 at 4.*

All this comes very near to closing the door on Gann's contract claim as a matter of law.

But recall Gann's testimony: Dealing with Walter was dealing with Bob. Folks like Gann must work with Bob's people, not Bob. The brothers are in business together, including in another hunting property, Goose Lake Lodge. *Doc. 15-6 at 14.* The brothers talk. As Gann said repeatedly "They work together." *E.g., Doc. 15-6 at 24.*

On Bullard's motion, the Court must take the material facts where disputed in the light most favorable to Gann. *Van Dorn*, 919 F.3d at 544. Note, too, what Bob did not say in his affidavit. He is silent about contacts with Walter. He didn't say he and Walter never discussed the Club property when Gann contacted Walter. Bob didn't say that Walter never sent him Gann's brochure. His affidavit implies these things didn't happen, but leaves open the possibility that they did. The gap, coupled with Gann's testimony that dealing with one Hixson was dealing with both, gives the Court pause. Whether a broker is entitled to a commission is "highly fact-dependent, and the court looks at the whole context of the relevant transaction." *Miller*, 316 Ark. at 392, 872 S.W.2d at 379. The Court has most of the material facts, but not all, and the current record is in some tension.

*

The best way forward is a bit more discovery, a renewed dispositive motion from Bullard, and some targeted briefing. Walter Hixson and Bob Hixson need to be deposed. (A remote video deposition of Bob is fine. And then his testimony will be available for trial if a trial is needed. *E.g., Doc. 29 & 32.*) For good cause, discovery is reopened until 29 May 2026. Bullard and Gann may renew their motions by 30 June 2026. (As the Court noted, though, Gann is unlikely to succeed short of trial.) There's no need to redo all the prior filings; the Court will consider everything of record. (The Court would also

–11–

appreciate directions on where to find Gann's brochure in the record or a color copy of it.)   Please just complete the record and file supplemental Local Rule 56.1 statements and responding statements. See the old Final Scheduling Order, *Doc. 11 at 3–4*, and the imminent new one, on the proper form for these statements.   Please also brief the procuring-cause doctrine's applicability.   The Court may have missed something.   It welcomes the parties' thinking.   They're entitled to be heard on this embedded issue before the Court makes a final decision. This case remains the first-out civil case set for trial in Helena the week of September 22nd.   Assuming no trial is needed in a criminal case, and assuming that this case needs a jury to resolve it, we will have our trial then.

*

Bullard's motion, *Doc. 15*, is partly granted and partly denied without prejudice.   Southern Forestry's unjust enrichment claim is dismissed without prejudice.   Southern Forestry's motion, *Doc. 17*, is denied without prejudice.   A Second Amended Final Scheduling Order will issue.

So Ordered.

_____
D.P. Marshall Jr.
United States District Judge

31 March 2026

-12-

## Real Estate Showing Agreement

This agreement between Don Bullard owner of Crooked Bayou Properties, LLC (SELLER) and Southern Forestry and Wildlife Real Estate (AGENT) that the SELLER will pay the AGENT a real estate commission for the procurement of a buyer for the property described as following:

Part of Section 34 and Section 35 of Township 17 South and Range 3 West; Section 3, Part of Section 10, and Part of Section 11 of Township 18 South and Range 3 West in Chicot County, Arkansas totaling +/-2,354 acres.

The real estate commission shall be the greater of the difference between the sale price and $5,500,000 dollars or $200,000.00.

Any potential buyer will be identified to SELLER either directly or through Mark Azlin, SELLER's manager. If an identified buyer buys or is a member of a business entity that buys the above-described property, the SELLER is responsible to paying the AGENT the agreed real estate commission. The SELLER will only be responsible for paying the AGENT when an identified buyer purchases the property.

Identified Buyer:

Steve Creekmore
Drake Mills

SELLER:

Don Bullard
Crooked Bayou, LLC

AGENT:

Benton Gann, Broker
Southern Forestry and Wildlife Real Estate